**FIFTH DIVISION
MCFADDEN, P. J.,
RAY and RICKMAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**October 3, 2018**

# In the Court of Appeals of Georgia

A18A1256. CHAMBERLAIN v. THE STATE.

RICKMAN, Judge.

John Chamberlain was tried by a jury and convicted on two counts of child molestation. On appeal, Chamberlain contends that the evidence was insufficient to support his convictions, the trial court violated his right to a public trial, his counsel rendered ineffective assistance in several respects, and the trial court erred by allowing improper testimony. For the following reasons, we affirm.

> On appeal from a criminal conviction, we view the evidence in the light most favorable to support the jury's verdict, and the defendant no longer enjoys a presumption of innocence. We do not weigh the evidence or judge the credibility of the witnesses, but determine only whether the evidence authorized the jury to find the defendant guilty of the crimes beyond a reasonable doubt in accordance with the standard set forth in *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

(Citation and punctuation omitted.) *Hall v. State*, 335 Ga. App. 895 (783 SE2d 400) (2016).

So viewed, the evidence showed that Chamberlain was the paternal uncle of the victim and her brother. Chamberlain and his brother, the victim's father, lived together, and the children stayed with them a few weekends a month. In October 2012, the then ten-year-old victim revealed to her cheerleading coach that she did not want to go to her father's house for the upcoming weekend. While upset and crying, the victim told her coach that she was not allowed to lock any doors at her father's house and that she disliked the lack of privacy while bathing. The coach told the victim's mother about the conversation.

The following morning, the victim's mother emailed the victim's school counselor expressing concerns about some unusual behaviors the victim exhibited at home, and asking her to speak with the victim. The victim told the school counselor that she was afraid to go to her father's house over the upcoming weekend. The school counselor testified that the victim tearfully informed her that Chamberlain hit her, locked her in her bedroom, looked at her in a "creepy" manner, "peek[ed]" at her while she was in the shower, and grabbed her breast and vaginal areas.

2

A corporal with the Forsyth County Sheriff's Office arranged for the victim to go to a child advocacy center for a recorded forensic interview. The forensic interviewer testified that the victim disclosed that Chamberlain touched her on her vagina, bottom, and breasts. The victim also described Chamberlain placing his penis on her neck area and "down her front part." Chamberlain called her names and said many demeaning things to her, including calling her "fatty" when he touched her. The recording of the forensic interview was published to the jury.

The corporal testified that he executed a search warrant at the home of the victim's uncle and father, and found a bag packed in the uncle's room that contained his passport and clothing. Interestingly, the corporal explained that approximately a year prior to executing this search warrant, he had executed another search warrant at the same residence during a child pornography investigation. The child pornography investigation involved the victim's father. Graphic videos were recovered from the victim's father's computer depicting female teenagers and very young children engaged in sexual acts.

Another corporal with the Forsyth Sheriff's Office who had investigated the child pornography case against the victim's father testified that the victim's father admitted that he had viewed and downloaded child pornography depicting pre-teens

3

approximately the same age as the victim. The victim's father used a variety of search terms to locate pornographic images, including "teenagers," "young teens," "underage," "incest," "pre-teen," and "bestiality," he entered chat rooms pertaining to dad and daughter sex, and he communicated with people who identified themselves as minors. Additionally, the victim's father engaged in a sexual online relationship with a minor child in which he presented himself as an 18-year-old.

He described his process for viewing videos after entering his desired search terms into a file sharing program: "I would just highlight everything that came up and I would hit enter and it would download it. And after it was done downloading I could look at the file and then if I liked it, I would rename it and save it. If I didn't like it, I would just delete it." The victim's father was never arrested or charged with any crimes related to the child pornography investigation. The corporal testified that the reason that the victim's father was not charged with possessing the child pornography was because the images were recovered from the unallocated space of the computer, meaning they had been deleted.[1]

---

[1] However, we note that a person may be prosecuted for possessing pornography that has been deleted and is recovered from a computer's unallocated space. See *New v. State*, 327 Ga. App. 87, 93-94 (1) (755 SE2d 568) (2014) ("In the context of prior possession of child pornography, a computer user knowingly possesses the contraband when the user intentionally downloads child pornography

The victim's mother testified that in the months prior to the revelation of the sexual abuse, she noticed changes in the victim's behavior including the victim acting withdrawn, losing friendships, lacking care as to her appearance, suffering academic problems, and noticeably gaining weight. The victim testified that Chamberlain "did bad things to [her]" by touching her "on [her] bottom and in [her] bathing suit zones." The victim testified that she woke up to Chamberlain lying on top of her in her bed and she could "sometimes" feel his penis. The victim answered affirmatively when asked if Chamberlain would "peek" at her while she was in the shower.

---

to the computer but later deletes the file or when he or she performs some function to reach out and select the image from the Internet. Indeed, a computer user who intentionally accesses child pornography images on a website gains actual control over the images, just as a person who intentionally browses child pornography in a print magazine 'knowingly possesses' those images, even if he later puts the magazine down. In this way, any backup or residual files become *evidence* of possession at a prior point; the files need not represent the literal contraband. Instead, the backed up or residual files are proof that a crime has occurred—that is, proof of the *corpus delicti*. And while these files *standing alone* are not sufficient to establish that a defendant knowingly possessed those images at a prior point, they can be used in conjunction with other circumstantial evidence to prove such possession. The totality of the evidence presented by the State, of course, must support an inference that the act was wilful and not inadvertent.") (citations, punctuation, and footnotes omitted; emphasis in original).

The grand jury indicted Chamberlain on two counts of child molestation[2] and invasion of privacy.[3] Following a jury trial, Chamberlain was convicted on the child molestation counts; he was acquitted of invasion of privacy. Chamberlain timely filed motions for new trial, which were denied. Chamberlain appeals from both his convictions and the denial of his motions for new trial.

1. Chamberlain contends that the evidence was insufficient to support his conviction on count one of the indictment.

"A person commits the offense of child molestation when such person . . . [d]oes any immoral or indecent act to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person[.]" OCGA § 16-6-4 (a) (1). Count one of the indictment charged Chamberlain with "commit[ing] an immoral and indecent act to [the victim], a child under the age of 16 years, with the intent to arouse and satisfy the sexual desires of himself by rubbing [his] penis on [the victim's] body[.]"

"The testimony of a victim of child molestation . . . need not be corroborated." (Citation and punctuation omitted.) *Smith v. State*, 320 Ga. App. 408, 410 (1) (a) (740

___

[2] OCGA § 16-6-4 (a) (1).

[3] The alleged victim of the invasion of privacy charge was the victim's brother.

SE2d 174) (2013). In this case, the victim testified that Chamberlain layed on top of her and "sometimes" she could feel his penis, the forensic interviewer testified that the victim disclosed to her that Chamberlain would place his penis on her neck area and "down her front part," and the victim's recorded forensic interview was played for the jury. This testimony was sufficient to sustain Chamberlain's conviction on count one of the indictment. See *Smith*, 320 Ga. App. at 411 (1) (a); see also *Malone v. State*, 277 Ga. App. 694, 696 (1) (627 SE2d 378) (2006).

2. Chamberlain contends that the trial court violated his right to a public trial when it closed the courtroom prior to the victim's and her brother's testimony.

> In the trial of any criminal case, when any person under the age of 16 is testifying concerning any sexual offense, the court shall clear the courtroom of all persons except parties to the cause and their immediate families or guardians, attorneys and their secretaries, officers of the court, victim assistance coordinators, victims' advocates, and such other victim assistance personnel . . . , jurors, newspaper reporters or broadcasters, and court reporters.

OCGA § 17-8-54. "This Code section is based upon a legislative determination that there is a compelling state interest in protecting children while they are testifying concerning a sex offense." (Citation and punctuation omitted). *Tolbert v. State*, 321 Ga. App. 637 (1) (742 SE2d 152) (2013). "The partial closure of the courtroom

7

permitted under this Code section does not violate a defendant's constitutional right to a public trial." Id.

Prior to the victim's and her brother's testimony, the State asked the trial court to clear the courtroom of all non-essential personnel. The defense objected[4] and the trial court referenced an exception for victims of child molestation and said that he would "follow the statute." The State responded that, "[t]he statute says . . . when any person under the age of 16 is testifying of any sexual offense, the [c]ourt shall clear the courtroom of all persons except parties to the case, their immediate family members or guardians, attorney, their secretaries, officers of the court, victim assistant coordinator's, advocates, and other such victim assistant personnel." An exchange took place between the trial court and counsel regarding the victim's mother remaining in the courtroom. The trial court then stated, "I don't [know] who else is present, but if the individuals do not fall under any of those categories, they need to stand outside until the child concludes testimony."

Chamberlain argues that the courtroom was completely closed because the victim's aunt, his sister-in-law, was excluded from the courtroom and that, in its

---

[4] We are pretermitting the issue of whether Chamberlain's objection was proper and thus, not addressing Chamberlain's alternative ineffective assistance of counsel claim on this issue.

recitation of the statue, the State failed to mention that the press was excepted from the statute. The trial court held that the victim's aunt did not fall under the category of "immediate family" and did not err in so holding. Black's Law Dictionary defines "immediate family" as "[a] person's parents, spouse, children, and siblings." Black's Law Dictionary (10th ed. 2014). Chamberlain also cannot show from the record that any member of the press was excluded. Accordingly, Clark has not identified from the record any person or category of persons who was wrongfully excluded under OCGA § 17-8-54.

The trial court partially closed the courtroom under OCGA § 17-8-54. This partial closure of the courtroom pursuant to that statute did not violate Chamberlain's Sixth Amendment right to a public trial. Accordingly, Chamberlain has not shown that the trial court erred. See *Tolbert v. State*, 321 Ga. App. at 637-638; see also *Clark v. State*, 309 Ga. App. 749, 751 (2) (711 SE2d 339) (2011); *Goldstein v. State*, 283 Ga. App. 1, 3 (2) (640 SE2d 599) (2006).

3. Chamberlain contends that his trial counsel rendered ineffective assistance by failing to call his own expert witness in forensic interviewing and by failing to object to testimony that he alleged went to the ultimate issue and improperly bolstered the victim's credibility.

9

To prevail on an ineffective assistance of counsel claim, Chamberlain must prove both that his trial counsel's performance was deficient and that he was prejudiced by this deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). "In reviewing a lower court's determination of a claim of ineffective assistance of counsel, we give deference to the trial court's factual findings, which are upheld on appeal unless clearly erroneous; however, we review the lower court's legal conclusions de novo." (Citation omitted.) *Washington v. State*, 276 Ga. 655, 658 (3) (581 SE2d 518) (2003).

"If an appellant fails to meet his burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." (Citation and punctuation omitted.) *Ward v. State*, 292 Ga. 637, 639 (2) (740 SE2d 112). "There is a strong presumption that the performance of trial counsel falls within the wide range of reasonable professional assistance. The reasonableness of the conduct is viewed at the time of trial and under the circumstances of the case." (Citation and punctuation omitted.) *Williams v. State*, 277 Ga. 853, 857 (6) (569 SE2d 597) (2004).

(a) Chamberlain argues that he received ineffective assistance of counsel because his counsel failed to call his own expert witness in forensic interviewing.

The decision of how to deal with the presentation of an expert witness by the opposing side, including whether to present counter expert testimony, to rely upon cross-examination, to forego cross-examination and/or to forego development of certain expert opinion, is a matter of trial strategy which, if reasonable, cannot be the basis of a successful ineffective assistance of counsel claim.

(Citation and punctuation omitted.) *Gawlak v. State*, 310 Ga. App. 757, 759 (2) (a) (714 SE2d 354) (2011).

At the motion for new trial hearing, Chamberlain's trial counsel testified that she had not "had very much success with expert witnesses in child molestation cases as to [challenging] the interviewing procedures unless there were . . . leading questions, not using open questions." Chamberlain's trial counsel testified that she reviewed the recording of the forensic interview and felt that an expert would not be beneficial in this case, and that her plan for attacking the forensic interviewer's testimony was through cross-examination.

"Here, trial counsel's decision to forego presentation of counter expert testimony and to rely instead on cross-examination to address the interviewing techniques of the state's witnesses was a matter of trial strategy, and [Chamberlain] did not establish that this tactical decision was unreasonable." *Gawlak*, 310 Ga. App.

11

at 759 (2) (a). "Although [Chamberlain's] appellate counsel might have made a different tactical decision, effectiveness of trial counsel is not evaluated by hindsight or by what present counsel would have done." Id. Accordingly, Chamberlain's trial counsel's decision to not call an expert does not support a claim for ineffective assistance of counsel. See id.; see also *Towry v. State*, 304 Ga. App. 139, 147 (2) (f) (695 SE2d 683) (2010).

(b) Chamberlain contends that he received ineffective assistance because his trial counsel failed to object to the corporal's testimony that went to the ultimate issue and improperly bolstered the victim's credibility.

> It is true that in Georgia, the credibility of a witness is to be determined by the jury, and the credibility of a victim may not be bolstered by the testimony of another witness. Thus, a witness may not give an opinion as to whether the victim is telling the truth. Furthermore, Georgia law generally precludes a witness from testifying as to his or her opinion regarding an ultimate issue in the case because to do so would invade the province of the jury.

(Citation and punctuation omitted.) *Canty v. State*, 318 Ga. App. 13, 16 (2) (733 SE2d 64) (2012).

However,

12

there is absolutely nothing wrong with expert opinion testimony that bolsters the credibility of the indicted allegations of sexual abuse, e.g., the victim's physical examination showed injury consistent with sexual abuse, or the victim's psychological evaluation was consistent with sexual abuse. Establishing the credibility of the indicted acts of sexual abuse is what the State's case is all about and is the purpose for such expert testimony in the first place; the fact that such testimony may also indirectly, though necessarily, involve the child's credibility does not render it inadmissible.

(Citations and punctuation omitted.) *Thompson v. State*, 321 Ga. App. 756, 758-759 (743 SE2d 446) (2013).

Chamberlain argues that his trial counsel should have objected to testimony from the corporal that several of the victim's behaviors were consistent with sexual abuse which, when combined, "certainly lead you to believe that there might be something going on." He further challenges counsel's failure to object to the corporal's testimony regarding the percentage of sexual abuse victims who recant and reaffirm, the lack of evidence that the victim's father was the perpetrator, and her statement that she would not expect a ten-year-old to misidentify the perpetrators.

The corporal was qualified as an expert in the areas of child sexual abuse, forensic interviewing, and the dynamics of disclosure. The corporal's testimony that

the victim's behavior was consistent with sexual abuse was not improper because it did not directly address the credibility of the victim or express a direct opinion that the victim was sexual abused. See *Reinhard v. State*, 331 Ga. App. 235, 239 (2) (770 SE2d 314) (2015); see also *Odom v. State*, 243 Ga. App. 227, 229 (1) (b) (531 SE2d 207) (2000). The general testimony regarding recantation and reaffirmation statistics and about whether a ten-year-old would generally be likely to misidentify her perpetrator were not improper for the same reasons. See *Harris v. State*, 340 Ga. App. 865, 874 (4) (798 SE2d 498) (2017) (holding that an expert in forensic interviewing of children's testimony about recantation was not improper because it "did not directly address the victim's credibility or express an opinion as to whether the child had actually been sexually abused"); see also *Pearce v. State*, 300 Ga. App. 777, 785 (6) (686 SE2d 392) (2009); *Odom*, 243 Ga. App. at 228 (1).

Finally, the corporal's testimony that there was no evidence that pointing to the victim's father as the perpetrator did not improperly bolster the victim's credibility or comment on the ultimate issue because it was not a comment on the victim's credibility or on the ultimate issue of whether the victim had been sexually abused. See generally *Odom*, 243 Ga. App. at 228-229 (1) (a).

14

Improper bolstering or ultimate issue objections to the challenged testimony would have been meritless, and failure to make a meritless objection cannot be evidence of ineffective assistance of counsel, the trial court did not err in denying Chamberlain's motion for new trial on this ground. See generally *Hardin v. State*, 344 Ga. App. 378, 386 (1) (e) (810 SE2d 602) (2018).

(c) Chamberlain contends that he received ineffective assistance because his trial counsel failed to object to the forensic interviewer's testimony that went to the ultimate issue and improperly bolstered the victim's credibility.

Chamberlain challenges testimony from the forensic interviewer in which she testified that the victim's demeanor was consistent with a victim of sexual abuse, and that there was nothing in the statement that was inconsistent with sexual abuse, that in her experience only a small amount of children have made false allegations, and that a child who has been coached generally cannot explain what her body felt like during the touch. Chamberlain also challenges the forensic interviewer's affirmative response when the State asked if was unusual that the victim was not crying when she was describing her abuse.

The forensic interviewer was qualified as an expert in the areas of child sexual abuse, the dynamics of disclosure, and child forensic interviewing. As discussed in

15

Division 4 (b), the forensic interviewer's testimony regarding the victim's demeanor and whether it was consistent with sexual abuse was not improper. See *Reinhard,* 331 Ga. App. at 239 (2). The forensic interviewer's general testimony about false allegations was not a direct comment on the credibility of the victim or a direct opinion that she was abused. See generally *Harris*, 340 Ga. App. at 874 (4); *Odom*, 243 Ga. App. at 228-229 (1) (a). Likewise, the testimony regarding details in the victim's disclosure that were inconsistent with being coached "did not impermissibly address the ultimate issue before the jury or bolster the child's credibility." *Osborne v. State*, 291 Ga. App. 711, 714 (3) (662 SE2d 792) (2008). It was also not inappropriate for the forensic interviewer to testify about the victim's behavior during the interview. The forensic interviewer was not testifying that the victim was abused, but rather was explaining the child's demeanor during her description of the events. See generally *Odom*, 243 Ga. at 229 (1) (a).

Since none of the challenged testimony was improper, any objection would have been meritless, and thus would not support a claim for ineffective assistance of counsel. See generally *Hardin*, 344 Ga. App. at 386 (1) (e).

16

(d) Chamberlain contends that he received ineffective assistance of counsel because his trial counsel failed to object to the school counselor's testimony which improperly bolstered the victim's credibility.

When asked what the victim's demeanor was like when the school counselor spoke with her, she testified that "[the victim was] remarkably strong for a nine- or ten-year-old little girl, but frightened. And really asking for someone to help her. And very vulnerable, I mean laying it all on the line. You know, indicating where she'd been touched and how – what had been said to her and her fears. You know, she wanted help and she wasn't going. And she didn't know who could help her."

"[T]estimony concerning the victim's demeanor was relevant and did not constitute improper bolstering." *Bridges v. State*, 293 Ga. App. 783, 785 (2) (668 SE2d 293) (2008). Accordingly, any objection to this testimony would have been meritless and could not support a claim for ineffective assistance of counsel. See *Hardin*, 344 Ga. App. at 386 (1) (e).

4. Chamberlain contends that the trial court erred by allowing improper testimony which went to the ultimate issue and bolstered the victim's credibility.

Here, the State asked the corporal how many child sex abuse cases she had investigated, and then asked her if "[i]n any of those cases has there ever been an

17

issue with a child misidentifying the perpetrator?" Chamberlain's counsel objected on the basis that the question called for a conclusion which the trial court overruled. The State then asked a series of follow up questions which elicited testimony from the corporal that in his experience, the cases involving the misidentification of a perpetrator by a victim usually involved very young children, and the children generally identified their perpetrators as monsters. The State then asked if the corporal would expect this issue with a ten-year-old victim, and he responded negatively. Chamberlain failed to object to any of the follow up questions.

"Due to the fact that [Chamberlain] did not object to [the corporal's] testimony at trial on the basis that he now asserts on appeal, our analysis of this issue is limited to a review for plain error affecting substantial rights." (Citation, punctuation and footnote omitted.) *Jones v. State*, 299 Ga. 40, 42 (2) (785 SE2d 886) (2016); OCGA § 24-1-103 (d) ("Nothing in this Code section shall preclude a court from taking notice of plain errors affecting substantial rights although such errors were not brought to the attention of the court."). The Georgia Supreme Court has adopted the federal plain-error standard of review. See *Gates v. State*, 298 Ga. 324, 326 (3) (781 SE2d 772) (2016). Pursuant to this four-pronged test,

First, there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

(Citation and punctuation omitted.) *Simmons v. State*, 299 Ga. 370, 373 (2) (788 SE2d 494) (2016).

As discussed in Division 3 (b), the corporal's testimony regarding whether a ten-year-old would generally be likely to misidentify her perpetrator did not go to the ultimate issue or improperly bolster the victim's credibility. Chamberlain fails to satisfy the first and second prongs of the plain-error test because he cannot show that the trial court erred in admitting the evidence, let alone that the alleged error was

19

"clear or obvious." See *Simmons*, 299 Ga. at 373-375 (2); see also *Patch v. State*, 337 Ga. App. 233, 242-243 (2) (786 SE2d 882) (2016).


*Judgment affirmed. McFadden, P. J., concurs in Divisions 1, 2, 3(b), 3(c), 3(d) and 4, and dissents in Division 3(a). Ray, J., concurs in Divisions 1, 2, 3(b), 3(c), 3(d) and 4, and in the judgment only in Division 3(a).\**

**\*DIVISION 3(a) OF THIS OPINION IS PHYSICAL PRECEDENT ONLY. COURT OF APPEALS RULE 33.2(a).**

# In the Court of Appeals of Georgia

A18A1256. CHAMBERLAIN v. THE STATE.

MCFADDEN, Presiding Judge, concurring in part and dissenting in part.

Allegations of ineffective assistance raised in this court that are based on trial counsel's failure to introduce evidence often share a fatal defect. The omitted evidence isn't introduced at the new-trial hearing either. But in the case before us today, the defense did call an expert witness at the new-trial hearing.

Attention must be paid to his testimony. His testimony demonstrated ways the credibility of the outcry, the methodology of the forensic interview, and the opinions of the state's expert witnesses could haven been challenged. And it demonstrated a

2

reasonable likelihood that, had such testimony been elicited at trial, the outcome would have been different.

I agree with the majority that the evidence was sufficient to support Chamberlain's convictions (Division 1), that the trial court did not violate his right to a public trial (Division 2), that the failure of Chamberlain's trial counsel to object to allegedly bolstering testimony did not constitute ineffective assistance of counsel (Divisions 3 (b), (c), and (d)), and that the trial court did not err in allowing allegedly bolstering testimony (Division 4). I disagree, however, with the majority's rejection of Chamberlain's argument that his trial counsel was ineffective in failing to call an expert witness on forensic interviewing (Division 3 (a)). Because Chamberlain has shown that trial counsel was deficient in that omission and that the deficiency prejudiced him, I respectfully dissent in part.

1. *Deficiency.*

As detailed below, this case involves trial counsel's decision not to call an expert witness on forensic interviewing based on trial counsel's preconceived — and erroneous — belief about what such an expert could offer the defense, which she based on her past experience with expert witnesses in other cases rather than on an investigation into the possible benefits of expert testimony to the defense of this

3

particular case. While decisions about how to respond to the opposing side's expert witnesses generally are a matter of trial strategy, see *Gawlak v. State*, 310 Ga. App. 757, 759 (2) (a) (714 SE2d 354) (2011), "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington*, 466 U. S. 668, 690-691 (III) (A) (104 SCt 2052, 80 LE2d 674) (1984).

"In assessing the reasonableness of an attorney's investigation, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Chatman v. Walker*, 297 Ga. 191, 193 (II) (B) (1) (773 SE2d 192) (2015) (citation and punctuation omitted). And while an appellate court is "not limited in [its] assessment of the objective reasonableness of lawyer performance to the subjective reasons offered by trial counsel for [her] conduct," *Shaw v. State*, 292 Ga. 871, 875 (3) (a) n. 7 (742 SE2d 707) (2013), a court "may not indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's

actions[.]" *Harrington v. Richter*, 562 U. S. 86, 109 (IV) (A) (1) (131 SCt 770, 178 LE2d 624) (2011) (citation omitted).

Here, the quantum of evidence known to trial counsel showed that the credibility of B. C.'s outcry was central to the state's case against Chamberlain. There was no physical evidence of molestation and there was no other witness to the alleged molestation. Moreover, there was evidence that might lead a jury to question the outcry, discussed in detail in Division 2, below. Trial counsel's defense centered on challenging both B. C.'s claim that she was molested and B. C.'s claim that Chamberlain was the perpetrator.

Without investigating the benefits of expert testimony regarding B. C.'s forensic interview, however, Chamberlain's trial counsel determined that such evidence "[w]ouldn't add one thing" to the defense. Explaining this assessment, she stated:

> Quite frankly, I haven't had very much success with expert witnesses in child molestation cases as to the interviewing procedures unless there were questions about leading questions, not using open questions. But I reviewed the videotape [of the forensic interview] and felt very confident that — based on my prior experience, that [the interviewer] had followed the common what I had seen over and over and over again, the interviewing process with the anatomical dolls. Objected to that in

5

previous cases. It had been allowed in. With using the anatomical drawings, it had been allowed in. In mean, it's just — the attacks on those things at the time are not — were not going to change the fact that that was coming in, having lost those arguments in previous cases.

Trial counsel's description of her past experiences, in which forensic interview evidence had been "allowed in" despite her objection, suggests that she primarily considered the use of expert testimony to challenge the *admissibility* of forensic interview evidence, rather that its use to challenge the *credibility* of the outcry that occurred in the forensic interview. Concluding from these past experiences that the expert testimony would be of no use in keeping out the forensic interview, she did not explore what credibility challenges an expert could make to B. C.'s outcry.

Chamberlain demonstrated that his trial counsel's preconceived beliefs about the benefits of expert evidence on forensic interviewing were wrong. At the hearing on his motion for new trial, he presented expert testimony demonstrating the ways that such evidence could have challenged the credibility of B. C.'s outcry. This expert testimony raised several significant challenges to the methodology of B. C.'s forensic interview, the statements elicited from the girl during that interview, and the opinions of the state's expert witnesses regarding that interview.

6

Chamberlain's expert testified that, had he been asked to testify in this case, his testimony would have included statements that:

- the protocol used in B. C.'s interview had weaknesses and was no longer used in Georgia;

- the interview contained several red flags that caused the expert concerns about its validity and raised the possibility of a "false positive" conclusion of sexual abuse, but the interviewer did not appropriately follow up on or respond to those red flags;

- the interviewer engaged in leading questions and techniques;

- the interviewer's use of anatomical drawings and dolls in the interview was a controversial practice, and the interviewer appeared to lead B. C. through her use of the dolls; and

- there was a strong possibility that B. C. had fabricated some of the details in the interview.

Chamberlain's expert also testified that he disagreed with aspects of the opinion testimony given by the state's experts at trial, and he would have criticized their conclusion that B. C.'s behavior was "consistent with" child sexual abuse, noting that "everything is consistent with child sexual abuse in terms of behavior so there isn't

7

any set of diagnostic behaviors that tell us a child has been sexually abused. [An abused] child might have PTSD or they might have no symptoms at all." Notably, Chamberlain's expert disputed the opinion of one of the state's experts that there was no evidence to suggest that B. C.'s father, rather than her uncle, was the real perpetrator. He opined that a person such as B. C.'s father, who had shown an interest in child pornography, was at greater risk to molest a child, and he testified about the possibility of "perpetrator substitution," rejecting the opinion of the state's expert that a child of B. C.'s age would not misidentify a perpetrator.

"When considering a claim of ineffectiveness, a critical distinction exists between inadequate preparation and unwise trial strategy." *Tezeno v. State*, 343 Ga. App. 623, 631 (2) (808 SE2d 64) (2017) (citation omitted). Trial counsel's decision not to call an expert was not the product of a tactical decision, see id., but stemmed from her failure to investigate the possible benefits of that evidence, apparently due in great part to a misapprehension of how the evidence could be used. See *Williams v. Taylor*, 529 U. S. 362, 395-396 (IV) (120 SCt 1495, 146 LE2d 389) (2000) (failure to conduct investigation due to misunderstanding of applicable law, rather than a strategic calculation, supported claim of ineffective assistance of counsel). Even applying a heavy measure of deference to trial counsel's decision not to investigate

8

using expert testimony to challenge the credibility of B. C.'s outcry, see *Strickland*, 466 U. S. at 691 (III) (A), I find that her failure to conduct that investigation fell below an objective standard of reasonableness. I see no potential advantage in simply forgoing this potential line of defense, cf. *Jones v. State*, 325 Ga. App. 895, 898 (2) (d) (755 SE2d 815) (2014) (discussing counsel's strategic decision to forgo cross-examination of witness in favor of "another tactical method or goal"), and no reason why any lawyer would choose, for strategic reasons, to limit his or her investigation in that manner.

2. *Prejudice.*

To show prejudice, Chamberlain must show a "reasonable likelihood that, but for counsel's error, the outcome of the trial would have been different." *Hood v. State*, 303 Ga. 420, 427 (2) (b) (811 SE2d 392) (2018) (citations omitted). He has met this burden.

As noted above, the credibility of B. C.'s outcry was central to the state's case against Chamberlain, because there was no physical evidence of molestation and there was no other witness to the alleged molestation. And there was evidence that might lead a jury to question the outcry. At one point B. C. recanted her outcry. Her mother and father, who were divorced, had an acrimonious relationship. For years B.

9

C. had complained about having to visit her father, who lived with Chamberlain, and had accused her father of neglect and abusive behavior on those visits. B. C.'s father admitted to having possessed child pornography and having posed as an 18-year-old in an online relationship with a minor.

Given the importance of B. C.'s outcry to the case and the existence of evidence from which a jury could doubt the outcry, trial counsel's failure to challenge the credibility of the outcry through expert testimony was a mistake that prejudiced Chamberlain's defense. There is a reasonable likelihood that, had trial counsel presented at trial the type of expert opinion offered at the hearing on the motion for new trial, the outcome of the trial would have been different.